**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| GEMALTO S.A., | § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 6:10-CV-561-LED |
| HTC CORPORATION, HTC AMERICA, INC., EXEDEA, INC., SAMSUNG ELECTRONICS CO., LTD., SAMSUNG TELECOMMUNICATIONS AMERICA LLC, MOTOROLA MOBILITY, INC., and GOOGLE INC., | § § § § § § § § | JURY TRIAL DEMANDED |
| Defendants. | § | |

**PLAINTIFF GEMALTO S.A.'S OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT OF INVALIDITY FOR INDEFINITENESS (D.I. 181)**

# **TABLE OF CONTENTS**

                                                                          **Page**

TABLE OF AUTHORITIES .................................................................................................... iii

NOTE ON CITATIONS ........................................................................................................... iv

INDEX OF EXHIBITS ............................................................................................................... v

I. INTRODUCTION ..........................................................................................................1

II. "RESOURCE CONSTRAINTS" IS NOT INSOLUBLY AMBIGUOUS. .........................2

      A. While Gemalto's Previous Construction Was Not Incorrect, Gemalto Offers a New Proposed Construction in an Attempt to Address Defendants' Confusion Regarding Gemalto's Originally-Proposed Construction ...........................................................2

      B. The Intrinsic Record Supports Gemalto's Construction ...........................................3

      C. The Extrinsic Evidence Supports Gemalto's Construction ......................................5

III. THE MEANS-PLUS-FUNCTION LIMITATIONS ARE NOT INDEFINITE .................9

      A. "Means for Mapping" ...............................................................................................10

      B. "Means for Translating" ..........................................................................................11

IV. "THE INTEGRATED CIRCUIT CARD" .....................................................................12

V. CONCLUSION .............................................................................................................13

# TABLE OF AUTHORITIES

**CASES**                                                             **Page(s)**

*Aristocrat Techs. v. Int'l Game Tech.*,
   521 F.3d 1328 (Fed. Cir. 2008) ............................................................................................. 9

*E-Pass Techs., Inc. v. 3COM Corp.*,
   343 F.3d 1364 (Fed. Cir.) ...................................................................................................... 8

*Exxon Research & Eng'g Co. v. United States*,
   265 F.3d 1371 (Fed. Cir. 2001) ......................................................................................... 2, 9

*Noah Systems, Inc. v. Intuit Inc.*,
   2012 U.S. App. LEXIS 7094 (Fed. Cir. April 9, 2012) ......................................................... 9

*PC Connector Solutions LLC v. SmartDisk Corp.*,
   406 F.3d 1359 (Fed. Cir. 2005) ............................................................................................. 8

*Source Search Techs., LLC, v. Lending Tree, LLC*,
   588 F.3d 1063 (Fed. Cir. 2009) ............................................................................................. 2

*Spansion, Inc. v. ITC*,
   629 F.3d 1331 (Fed. Cir. 2010) ............................................................................................. 1

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
   659 F.3d 1376 (Fed. Cir. 2011) ............................................................................................. 9

## **NOTE ON CITATIONS**

- References to the patents-in-suit are indicated by column and line number, or by claim number. Unless stated otherwise, all references are to the specification of the '317 patent. A reference to "3:15-17" therefore means column 3, line 15 through line 17 of the U.S. Patent No. 6,308,317.

# INDEX OF EXHIBITS

Ex. 1    Declaration of Neeraj Gupta in Opposition to Defendants' Motion for Summary Judgment of Invalidity for Indefiniteness ("Gupta Decl.")

Ex. 2    US Patent No. 6,687,898

Ex. 3    US Patent No. 6,990,662

Ex. 4    US Patent No. 7,801,068

Ex. 5    LinkedIn Profile of Kabe VanderBaan

Ex. 6    US Patent No. 6,430,599

Ex. 7    Curriculum Vitae of Dr. Jens Palsberg

Ex. 8    Brylow, Dennis, Damgaard, Niels, Palsberg, Jens, "*Static Checking of Interrupt-driven Software*," Purdue University, Proceedings of ICSE'01, International Conference on Software Engineering, pages 47-56, 2001

## I. INTRODUCTION

Plaintiff Gemalto S.A. ("Gemalto") respectfully submits this brief in opposition to Defendants' motion seeking summary judgment of invalidity for indefiniteness of certain asserted claims from U.S. Patent Nos. 6,308,317 ("the '317 patent"); 7,117,485 ("the '485 patent"); and 7,818,727 ("the '727 patent") (collectively, "the patents-in-suit"). (*See* Dkt. 180, 181.) Defendants' motion should be denied.

First, Defendants' arguments that the term "resource constraints" is indefinite, ring hollow in the face of pervasive use of that term in the extrinsic evidence, including the use of the term in Defendants' own patents and documents and by Defendants' own recently-disclosed expert. While coming to a construction of a term is not always easy, this does not lead to a conclusion that the term in question can not be defined.

Second, Defendants' arguments that certain means plus function elements are indefinite for lack of corresponding structure, ignore the step-by-step procedure described in the patents, including the claims themselves, of the detailed algorithms to implement the recited functions.

Third, Defendants' feigned confusion over the typographical error in certain claims of the '317 patent, is easily resolved by the unambiguous file history.

Because patents are presumed to be valid and the Defendants cannot carry their heavy burden to show facts supporting a conclusion of invalidity by clear and convincing evidence, *Spansion, Inc. v. ITC*, 629 F.3d 1331, 1344 (Fed. Cir. 2010), Defendants' request for summary judgment should be denied.

- 2 -

## II. "RESOURCE CONSTRAINTS" IS NOT INSOLUBLY AMBIGUOUS.

### A. While Gemalto's Previous Construction Was Not Incorrect, Gemalto Offers a New Proposed Construction in an Attempt to Address Defendants' Confusion Regarding Gemalto's Originally-Proposed Construction

During claim construction, rather than simply reciting plain meaning, Gemalto attempted to rephrase this claim limitation. Accordingly Gemalto offered a construction that set up a relative comparison of resources.[1] Rather than offer up a competing construction, Defendants simply claimed that the term was indefinite

For a claim to be indefinite, however, it must not be "amenable to construction;" rather, it must be "insolubly ambiguous." *Source Search Techs., LLC, v. Lending Tree, LLC,* 588 F.3d 1063, 1076 (Fed. Cir. 2009). This heightened standard is driven by a policy that "accord[s] respect to the statutory presumption of patent validity . . . and . . . protect[s] the inventive contribution of patentees, even when the drafting of their patents has been less than ideal." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). Accordingly, for a claim language to be definite, "[a]bsolute clarity . . . is not necessary." *Source Search Techs., supra*. Rather,

> If the meaning of the claim is discernable, ***even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree***, [the Federal Circuit] ha[s] held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.

*Id.* (internal quotes omitted) (emphasis added).

Upon review of Defendants' briefing, Gemalto better understood why Defendants asserted confusion as to the original construction—making assessments at different times and the use of labels (e.g., "personal computer") can lead to complexities (Dkt. 180 at 19-20). Further,

---

[1] Gemalto's original construction was "computing resources that are limited when compared to conventional computing platforms, such as microprocessor-based desktop and personal computers."

- 2 -

McKool 442502v1

- 3 -

Gemalto reviewed the use of the term by the Defendants' own recently-disclosed expert in his publications. Also, in view of Defendants' expert having used the term, Plaintiffs retained their own expert, Neeraj Gupta, to provide background and clarification regarding the term.

In view of Defendants' claimed confusion, and further in light of the extrinsic evidence, including the use of the term by Defendants' expert, Gemalto therefore now offers a revised construction that precisely captures the meaning of the term set forth in both the intrinsic and extrinsic record. Gemalto's newly-proposed construction of "resource constraints" is "limits on computing resources imposed by the physical characteristics of the device." This proposed construction remains consistent with the intrinsic record and with the wide use of the term within the computing arts, including by Defendants' own employees and expert.

### B. The Intrinsic Record Supports Gemalto's Construction

Gemalto's new construction is clear and is based on how the resource constraints are described in the specification. The patents recognized that all computing devices have a finite amount of resources at their disposal, including the amount of memory, processing power and long-term storage. The patentees also recognized, however, that certain computing "platforms" had more resources than others. At the time of the filing of the patent application, Java-based programs had been written to execute within the constraints of then-existing typical personal computers (referred to as "conventional platforms"). (Ex. 1, Gupta Decl. at ¶ 13; 1:49-54 (a Java application and Java virtual machine "must be written [such] that [it] will run within the *constraints* of the platform… [and] a mechanism must be provided for loading the desired Java application on the platform, again keeping within the *constraints* of the platform.")) Noting that there are no corresponding Java implementations for microcontrollers, such as "would typically be used in a smartcard" (1:59-61), the patentees set up the distinction between the baseline resources of one class of devices (typical microprocessor-based desktop and personal computers,

i.e., general purpose computing platforms that have ample amounts of physical space to devote to memory, etc.) and the reduced resources of another class of devices (microcontroller-based devices, i.e. embedded computing platforms such as a smartcard, cellular telephone, automotive control circuit that had a limited amount of resources with which to support the Java platform). (Ex. 1, Gupta Decl. at ¶ 12; 1:49-2:48, 18:31-42 and 18:65-19:30; Figs. 21-25 (showing examples of microcontroller-based specific purpose or embedded application computing platforms).)

The specification thus describes a first class of devices, i.e., typical microprocessor-based desktop and personal computers, whose resources are typically not limited by the physical space available but by other factors (such as cost, electrical design limitations, etc.), and a second class of devices, i.e., microcontroller-based devices, whose resource are limited by the physical space available. For example, in describing the smart card embodiment, the specification describes a device that "has substantially the same dimensions as *a typical credit card.*" (7:58-59.) The limits on resource imposed as a result of the physical characteristics (the amount of space available) is explicitly recited in the specification: "As compared to the relatively large external memory [in a typical desktop computer running Java] accessed by the microprocessor, the typical microcontroller accesses a much smaller memory (2:5-8) because "[i]n a microcontroller, the amount of each kind of memory [(RAM, ROM and EEPROM)] available is *constrained by the amount of space on the integrated circuit* used for each kind of memory" (2:14-16). The specification makes it clear that "resource constraints" are "limits on computing resources imposed by the physical characteristics of the device." (Ex. 1, Gupta Decl. at ¶¶ 12-13.)

The conversion techniques described and claimed in the patents-in-suit allow applications written in a high level language to be interpreted by a virtual machine within the "set of resource

- 4 -

McKool 442502v1

constraints" of that particular platform.  The improvements brought about through conversion include the following:

- **Reducing the size of applications by compacting class files**.  (*See, e.g.*, 9:27-29 ("The card class file converter 26 compacts the constant pool 42 found in the Java class file 24a into an optimized version.") ; *see also* 8:36-39, 8:66 - 9:2.)

- **Reducing the size of the virtual machine**.  (*See, e.g.*, 10:34-47 ("[T]he card class file converter converts specific byte codes into generic byte codes … [t]his translation is done to reduce the number of byte codes translated by the Card JVM 16, consequently reducing the complexity and code space requirements for the Card JVM 16."); *see also* 11:4-18 ("This modification [byte code renumbering] may be done in order to reduce the program space required by the Card JVM 16 to interpret the byte code.").)

- **Enhancing the execution speed of applications**.  (*See, e.g.*, 11:25-36 ("[T]he card class file converter modifies the original byte codes 60 into a different set of byte codes designed for a different virtual machine architecture… this option may provide an increase in execution speed…"); *see also* 13:29-35.)

- **Rapid prototyping using standard Java development tools**. (*See, e.g.*, 4:4-8 ("Embedded systems using microcontrollers can also gain many of these advantages for downloading new applications, high level program development, and rapid prototyping by making use of this invention.").)

The patents-in-suit teach multiple mechanisms as part of conversion to optimize Java class files to run using fewer resources.  While all devices can benefit as a result of the patented conversion technology, devices "operating under a set of resource constraints" (i.e., resource-constrained devices) will enjoy the primary benefit because these devices will have computing resources that are limited by their physical characteristics (e.g., their size).

### C. The Extrinsic Evidence Supports Gemalto's Construction

There is also ample extrinsic evidence, including from the employees of one of the Defendants, that those skilled in the art view the terms "resource constraints" and its adjectival counterpart "resource constrained" as defining the relative processing capability between two classes of devices, one class being desktop computers which are typically not constrained in

- 5 -

McKool 442502v1

computing resources by their physical characteristics with the class of handheld or mobile devices that are constrained in computing resources by their physical characteristics. This includes at least one patent whose named inventor is an employee, indeed a "Distinguished Member of the Technical Staff" of Defendant Motorola Mobility:

- ***Resource-constrained devices are generally considered to be those that are relatively restricted in memory and/or computing power or speed, as compared to typical desktop computers*** and the like. By way of example, other resource constrained devices include cellular telephones … and other miniature or small footprint devices. (Ex. 2, U.S. Patent No. 6,687,898, 3:1-8.)

- ***Mobile embedded devices in use today provide computing power, but operate under increased resource constraints compared to their desktop or server counterparts***. While desktop computer systems often use microprocessors running at clock frequencies of 1 gigahertz or more, and are equipped with 256 MB of RAM or more, a typical handheld computer device has only a fraction of such power. (Ex. 3, U.S. Patent No. 6,990,662, 1:54-64.)

- Typically the devices connected to the MICE comprise machines ***such as personal computers*** that have the necessary resources and/or capabilities to receive all of the feeds sent to a multicast group to which the machine is a member. However, to extend the functionality of the system, ***it may be desirable to introduce a device having more limited resources and/or capabilities (also referred to herein as a resource-constrained device or RCD). The limited resources and/or capabilities may result from, for instance, the RCD having reduced processing speed, available bandwidth, etc***. or the RCD being limited to receiving one kind of data (e.g., only audio data). ***Examples of an RCD include, but are not limited to, a handheld device, a cellular telephone, a radio, a personal digital assistant (PDA), etc***. (Ex. 4, U.S. Patent No. 7,801,068, 1:36-50 (inventor Kabe Vanderbaan employed by defendant MMI (Ex. 5, Kabe Vanderbaan LinkedIn profile)).)

- As used herein, a small footprint device is a hardware device comprising ***computing resources such as a processor and a system memory, but having significantly greater constraints on one or more of these resources than a typical desktop computer has.*** For example, a small footprint device may have two megabytes of memory or less, whereas a typical desktop system may have 64 megabytes or more. Also a typical small footprint device may have significantly less processing power than a typical desktop computing system, either in terns of processor type, or processor speed, or both. For example, a personal data assistant device may have a 16 MHz processor, whereas a typical desktop system may have a processor speed of 100 MHz or higher. Also, a typical small footprint device may have a display size significantly smaller than the display screen of a desktop

- 6 -

> computing system. For example, the *display screen of a handheld computer is typically small compared to the display screen of a desktop monitor*. (Ex. 6, U.S. Patent No. 6,430,599, 4:29-47.)

In addition to applying the same definition as Gemalto in the specification, these patents also make use of "resource-constrained" in the claims. When combined with numerous other patents that also recite "resource constraints" and "resource constrained" in both the specification and claims,[2] there can be no question that the term has meaning to a person of ordinary skill.

Defendants' arguments further ring hollow when one considers that their own expert uses the term "resource constrained" to refer to handheld or mobile devices that are constrained in computing resources by their physical characteristics. Defendants recently disclosed Dr. Jens Parlsberg of the Department of Computer Science at UCLA as one of their experts. Dr. Palsberg's curriculum vitae recites as follows: "[w]hile powerful processors are increasingly being used for small tasks, the demand for cost-effective computation is also forcing the use of smaller, resource-constrained devices in even greater numbers." (Ex. 7, CV of Dr. Jens Palsberg at 4.) A quick literature search reveals additional publications in which Dr. Palsberg uses the term. For example, the paper entitled "Static Checking of Interrupt-driven Software" commences with the following: "*Resource-constrained devices are becoming ubiquitous. Examples include cell phones, palm pilots, and digital thermostats*. It can be difficult to fit required functionality into such a device without sacrificing the simplicity and clarity of the software." (Ex. 8, "Static Checking of Interrupt-driven Software" at 1.) Dr. Palsberg's use of the term is consistent with the way the term is used in the patents-in-suit and within the art and belies Defendants' assertions that the "boundaries of 'resource constraints' are not discernable."

---

[2] Gemalto previously identified these patents in Appendix 2 to its Opening Claim Construction Brief (Dkt. 163) and also provided PDF copies of these patents on CD with the Court's hard copy of that brief.

- 7 -

Contrary to Defendants' assertions that the patents-in-suit "provide[] no guidance as to the metes and bounds of what memory …. a device must have to qualify as 'resource constrained,'" the patents-in-suit (and ample amounts of extrinsic evidence) give a person of ordinary skill in the art absolute clarity to determine whether a device or class of devices is "operating according to a set of resource constraints" or "resource constrained."[3] A person of skill in the art will easily know to look at the resources (e.g., system memory, processing clock speed, processing power) available in a device and determine whether those resources are limited by the physical characteristics (e.g., size shape, etc.) of the device. Using memory as an example, a person of skill in the art can readily determine the amount of memory available on an accused device and determine whether the amount of memory is "limited" by the amount of space available for memory on that device.

Rather than offering their own construction to a widely used term, Defendants merely resorted to criticism for Gemalto's original proposal, alleging that it changes over time and relying on *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359 (Fed. Cir. 2005), a case which does not even address the issue of indefiniteness. While Gemalto maintains the propriety of its original proposal,[4] it recognizes the complexities associated with that

---

[3] Defendants' use of inventor testimony in an attempt to support their arguments is disingenuous. First, as a matter of law, inventor testimony is irrelevant. *See, e.g., E-Pass Techs., Inc. v. 3COM Corp.,* 343 F.3d 1364, 1370 n.5 (Fed. Cir.) ("this court has often repeated that inventor testimony is of little probative value for purposes of claim construction"). Additionally, whether the inventors know the amount of memory contained in their computers and phones has absolutely no bearing on the ability of a person of skill in the art to discover the typical amount of memory available in these classes of devices at any given time.

[4] Gemalto's original construction did not change over time, but rather distinguished between the resources of different classes or types of computing platforms: conventional computing platforms, i.e., microprocessor-based platforms, such as desktop and personal computers, from specific purpose or embedded application computing platforms, i.e., microcontrollers-based platforms. Moreover, the *PC Connector* Court did not deal with the issue of what is "conventional" in the technology is consistently changing with time. In the realm of computing resource, a person of skill in the art recognizes that there is a temporal aspect to what is "conventional" in desktop and personal computers,. as the state of the art in computing resources is constantly expanded according to Moore's Law. (Ex. 1, Gupta Decl. at ¶ 15.) What would be considered state of the art, i.e., computing platforms having a level of development reached at any particular time as a result of the latest technology, at one point in time will be

construction and has endeavored to simplify the approach while maintaining the clear distinction that exists in the patent and the art. Because Gemalto's construction is "sufficiently precise to permit a potential competitor to determine whether or not he is infringing," *Exxon*, 265 F.3d at 1376 (quoting *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470, (Fed. Cir. 1993)), the term is definite and the Court should construe it to mean "limits on computing resources imposed by the physical characteristics of the device."

### III. THE MEANS-PLUS-FUNCTION LIMITATIONS ARE NOT INDEFINITE

Defendants assert that the "means for mapping" and "means for translating" limitations in the asserted claims are indefinite. The parties agree these limitations are governed by §112, ¶6, but Defendants contend that the inventors failed to disclose sufficient corresponding structure and more specifically, that the patents-in-suit fail to disclose algorithms to implement the recited function on a programmed computer, as the Federal Circuit requires. *Aristocrat Techs. v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008). Gemalto contends that the inventors provided step-by-step procedure for implementing the recited functions, in both flowchart and prose form, and thus satisfied its obligations under §112, ¶2. *See Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1384 (Fed. Cir. 2011). As is presently the case, "[w]hen the specification discloses some algorithm… the question is whether the disclosed algorithm, from the viewpoint of a person of ordinary skill, is sufficient to define the structure and make the bounds of the claim understandable." *Noah Systems, Inc. v. Intuit Inc.*, 2012 U.S. App. LEXIS 7094, at *25 (Fed. Cir. April 9, 2012)(citations omitted.). Because the disclosure of the patents-in-suit,

---

considered antiquated within several years. Indeed, while the comparison of computing platforms to determine "resource constraints" is fixed, a person of skill in the art would necessarily consider time in determining whether a desktop or personal computer platform is "conventional."[4] (*Id.*, at ¶ 16.) As a result, at any particular point in time, one can identify whether a device operates with "resource constraints" relative to a "conventional desktop or personal computer" by comparing the computing resources of the first device to the computing resources of the desktop or personal computer of the same period. (*Id.*, at ¶ 14.)

McKool 442502v1

including the algorithm steps recited in the claims and the specification, identifies sufficient structure to a person of ordinary skill, these claim limitations are not indefinite. Again, Defendants cannot carry their heavy burden to invalidate these claims in light of the detailed description by the patents-in-suit.

### A. "Means for Mapping"

The recited function for this limitation is "mapping such strings to unique identifiers." "Such strings" refers to the earlier recitation of the "identifying strings for objects, classes, fields or methods" in the claims in which the "means for mapping" appears (e.g., 25:24-27). The function of mapping strings is described as part of the "class file converter." (9:19-23, Fig. 5.) The "class file converter" is part of the "terminal 14" that "prepares and downloads Java applications." (7:66-67.) The "terminal" is also described as a personal computer, providing Java development support. (7:51-55.) This computer forms the foundation for the structure for the means-plus-function limitations of the Gemalto Patents, including the "means for including attributes" limitation upon which the parties have agreed. (Dkt. 157, JCCS, at 2.)

The "mapping" aspect of the "class file converter" is shown in element 51b of Figure 5 and further described in detail at column 9. which further describes the mapping function as being performed by replacing strings in the constant pool of the class file with a corresponding integer:

> This compaction [of the constant pool] is achieved by mapping all the strings found in the class file constant pool 42 into integers (the size of which is microcontroller architecture dependent). These integers are also referred to as IDs. Each ID uniquely identifies a particular object, class, field or method in the application 20. Therefore, *the card class file converter 26 replaces the strings in the Java class file constant pool 42 with its corresponding unique ID*.

(9:29-37, Fig. 5.) By replacing strings in the constant pool with an integer, the converter significantly reduces the amount of memory required to store the constant pool. (9:27-29; (Ex. 1,

-10-

Gupta Decl. at ¶ 20.) Defendants, however, contend that "Gemalto has only pointed to language that merely repeats the <u>function</u> of the" limitation. In doing so, Defendants conveniently ignore the complete language of the portion of the specification cited above and do not even attempt to address Gemalto's arguments that the algorithm for this limitation "replaces the strings in the Java class file constant pool 42 with [a] corresponding unique ID." Defendants have not met their burden. Accordingly, this element should be construed to include a computer programmed to replace strings in the class file constant pool with fixed-size integers to compact the constant pool, as set forth in Figure 5 (element 51b) and in the prose of columns 7 and 9 of the specification, as shown above.

### B. "Means for Translating"

Gemalto incorporates by reference its arguments regarding the "means for translating" in its Opening Claim Construction Brief. (Dkt. 163 at 23-25.) As with the "means for mapping" limitation, Defendants cannot meet their burden with respect to this limitation and further fail to address the key aspects supporting Gemalto's proposed construction. Defendants did not attempt to address the scope of the recited function, which Gemalto contends is "translating from the byte codes in the compiled form to byte codes in a format suitable for interpretation by the interpreter." Defendants also fail to address Gemalto's arguments that the specific algorithmic steps set forth explicitly in the language of this limitation, and as added by the patentees, should be considered part of the corresponding structure for that recited function and which is further defined in the prose of the specification. (Ex. 1, Gupta Decl. at ¶¶ 24-25.) Having made no substantive effort to rebut the arguments supporting Gemalto's proposed construction, Defendants have not met their burden on indefiniteness.

## IV. "THE INTEGRATED CIRCUIT CARD"

Gemalto incorporates by reference its arguments regarding its request that the Court correct the typographical error of "the integrated circuit card" in in claims 58, 65, 78, 87, 88 and 92 of the '317 patent in its Opening Claim Construction Brief. (Dkt. 163 at 25-29.) In response to Gemalto's request that the Court correct an obvious error, Defendants offer two arguments in support of their position that the correction is subject to a reasonable debate. This first argument is that the typographical error could just as easily been the inclusion of the term "microcontroller" in the preamble of these claims. This argument is nonsensical. These claims, as originally drafted and submitted to the PTO, were directed to a "microcontroller" and were only modified and further limited in the reexamination proceedings. Because these "microcontroller" claims have limitations that track those of the "integrated circuit card" claims of the '317 patent, it would have made no sense for the patentees to change the preambles in limitation to create duplicates or near-duplicates of claims that already existed. This "explanation" is not plausible.

Defendants' second "explanation," that the body could have been modified to recite to "<u>an</u> integrated circuit card," is equally nonsensical. These claims are directed to a "microcontroller comprising: a memory storing … an interpreter configured to interpret applications …" The step of "renumbering byte codes … to equivalent byte codes in an instruction set supported by an interpreter" only makes sense if the interpreter is stored in the memory of "the microcontroller." It would make no sense to perform the step of "renumbering byte codes" for a <u>completely different machine</u> (i.e., "an integrated circuit card"), especially when the remaining limitations of these claims are directed to the "microcontroller." This "explanation" is also not plausible. Defendants simply can not offer a plausible reason as to why a reasonable debate might exist regarding the typographical error in these claims and therefore

have not given the Court a valid basis to refuse Gemalto's requested correction. Accordingly, Gemalto respectfully requests that the Court correct the error and modify "the integrated circuit card" in claims 58, 65, 78, 87, 88 and 92 of the '317 patent to "the microcontroller."

## V. CONCLUSION

For the reasons set forth herein and in Gemalto's Opening Claim Construction Brief, Defendants' motion for summary judgment of indefiniteness (Dkt. 181) should be denied and the Court should adopt Gemalto's proposed claim constructions.

Dated: April 23, 2012

Respectfully submitted,

*/s/ Sam Baxter*
Sam Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
MCKOOL SMITH, P.C.
104 East Houston, Suite 300
Marshall, Texas 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Robert A. Cote
rcote@mckoolsmith.com
John Petrsoric
jpetrsoric@mcoolsmith.com
Radu A. Lelutiu
rlelutiu@mckoolsmith.com
Shahar Harel
sharel@mckoolsmith.com
Allison Speigel
aspeigel@mckoolsmith.com
MCKOOL SMITH, P.C.
One Bryant Park, 47th Floor
New York, New York 10036
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

Peter J. Ayers
payers@mckoolsmith.com
Pierre Hubert
phubert@mckoolsmith.com
Laurie L. Fitzgerald
lfitzgerald@mckoolsmith.com
Geoffrey L. Smith
gsmith@mckoolsmith.com
Todd Bellaire
tbellaire@mckoolsmith.com
Christopher J. Mierzejewski
cmierzejewski@mckoolsmith.com
MCKOOL SMITH, P.C.
300 W. 6th St., Ste. 1700
Austin, Texas 78701
Telephone: (512) 692-8700
Facsimile: (512) 692-8744

**ATTORNEYS FOR PLAINTIFF GEMALTO S.A.**

McKool 442502v1

## CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who have consented to electronic services on this the 23rd Day of April, 2012. Local Rule CV-5(a)(3)(A).

                                        /s/ John Petrsoric
                                        John Petrsoric

McKool 442502v1